IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re PIXAR SECURITIES LITIGATION

This Document Relates To:

    ALL ACTIONS.

No. C 05-04290 JSW

**AMENDED ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

    Lead plaintiff Frederick P. Arndt ("Plaintiff") brings this action individually and on behalf of all other persons who purchased or otherwise acquired the common stock of defendant Pixar ("Pixar") between February 10 and June 30, 2005 (the "Class Period"),[1] pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. 240.10b-5. Now before the Court is the motion to dismiss the Amended Complaint ("Complaint") filed by defendants Pixar, Steven P. Jobs ("Jobs"), Edwin E. Catmull ("Catmull"), and Simon T. Bax ("Bax") (collectively "Defendants"). Defendants move to dismiss asserting that Plaintiff fails to meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and fail to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and 12(b)(9). Defendants further assert that further amendments to the Complaint would be futile and request that the Court dismiss this action with prejudice.

---

[1] The Court has not yet certified a class and refers to the time period involved as the "Class Period" for ease of reference.

The motion to dismiss is now fully briefed and ripe for decision. The Court finds that this matter is appropriate for disposition without oral argument and the matter is deemed submitted. *See* N.D. Civ. L.R. 7-1(b). Accordingly, the hearing set for September 15, 2006 is VACATED. Having carefully reviewed the parties' papers, considered their arguments and the relevant legal authority, the Court hereby GRANTS Defendants' motion to dismiss.

**FACTUAL BACKGROUND**

Pixar

**ANALYSIS**

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud;
(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or;
(c) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To plead a claim under section 10(b) and Rule 10b-5, a plaintiff must allege (1) a misrepresentation or omission, (2) of material fact, (3) made with scienter, (4) on which the plaintiff justifiably relied, (5) that proximately caused the alleged loss. *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999). Additionally, as in all actions alleging fraud, a plaintiff must state with particularity the circumstances constituting fraud. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (9th Cir. 1999); Fed. R. Civ. P. 9(b).

Plaintiffs also claim that individual defendants are liable pursuant to Section 20(a) of the Securities Exchange Act, which provides for derivative liability for those who control others found to be primarily liable under the provisions of that act. *See In re Ramp Networks, Inc. Sec.*

2

*Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same. *Id.*

**A.      Applicable Pleading Standards.**

**1.      Rule 12(b)(6).**

A motion to dismiss is proper under Rule 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss should not be granted unless it appears beyond a doubt that a plaintiff can show no set of facts supporting his or her claim. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).

**2.      Private Securities Litigation Reform Act.**

In order to limit the number of frivolous private securities lawsuits, Congress enacted the PSLRA in December of 1995, and created heightened pleading standards for such lawsuits. 15 U.S.C. § 78u-4(b). The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Furthermore, the PSLRA requires that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The heightened standard set by the PSLRA was intended to put an end to securities fraud lawsuits that plead "fraud by hindsight." *In re Silicon Graphics, Inc. Sec. Lit.*, 183 F.3d 970, 988 (9th Cir. 1999). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity *and* scienter." *In re Vantive Corp. Sec. Lit.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)) (emphasis added). "Thus the complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with 'actual

3

knowledge . . . that the statement was false or misleading.'" *Id.* at 1085 (citing 15 U.S.C. § 78u-5(c)(1)(B)(I)). This is often accomplished "by pointing to inconsistent contemporaneous statements or information (such as internal reports) made by or available to the defendants." *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (quoting *In re GlenFed Sec. Lit.*, 42 F.3d 1541, 1549 (9th Cir. 1991) (*en banc*)); *see also id.* at 994 (discussing insufficiency of plaintiffs' allegations with regard to the non-disclosure of confidential non-public information).

Under the PSLRA, a complaint still is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. *Silicon Graphics*, 183 F.3d at 983. To determine whether a plaintiff has pled a strong inference of scienter, however, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). The Court "should consider all the allegations in their entirety, together with any reasonable inferences therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." *Id.* "Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss." *In re Northpoint Communications Group, Inc. Sec. Lit.* (*Northpoint II*), 221 F. Supp. 2d 1090, 1094 (N.D. Cal. 2002).

Finally, the Court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when the authenticity of those documents is not questioned, and other matters for which the Court can take judicial notice. *Northpoint II*, 221 F. Supp. 2d at 1094; *see also Silicon Graphics*, 183 F.3d at 986.

**B.   Request for Judicial Notice.**

[**check**] Defendants request that the Court take judicial notice of ... press releases, SEC filings, and the FDA's document entitled Guidance for Industry, all of which are referenced in the Complaint or are publicly filed documents. Plaintiffs do not dispute the accuracy of the documents attached to the request, and the requested documents are the types of documents of which this Court properly make take judicial notice. *See, e.g., In re Calpine Corp. Sec. Lit.*, 288

F. Supp. 2d 1054, 1076 (N.D. Cal. 2003) (court "may properly take judicial notice of SEC filings and documents expressly referenced" in a complaint"); *see also Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998). Accordingly, the Court GRANTS Defendants' request.

**C.     Plaintiff Fails To Plead Sufficient Facts to Demonstrate Falsity.**

The PSLRA requires that Plaintiff allege with the requisite particularity each statement alleged to be false or misleading, the reason or reasons why the statement was false or misleading, and if those allegations are made on information and belief, all facts on which that belief is formed. *See* 15 U.S.C. § 78u-4(b)(1)(B); *see also Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004).

**1.     Plaintiff does not clearly identify which statements are false.**

Throughout the Complaint, Plaintiff engages in a pattern of quoting large excerpts from documents or conference calls that are comprised of multiple statements.

Plaintiff sets forth the statements which he contends are materially false and misleading in paragraphs 51, 54-55, and 57-61 of his Complaint. These paragraphs contain extensive block quotes with multiple statements. These paragraphs, on their face, appear to contain true facts or statements which Plaintiff does not seem to contest. (Compl. ¶¶ 51, 54-55, 57-61.) For example, on March 17, 2005, Defendants filed Pixar's 2004 10-K form with the SEC in which Plaintiff alleges that Defendants state, *inter alia*: "towards the end of the life cycle for a revenue stream, Disney may inform us, and has in the past informed us, of additional distribution costs to those previously forecasted. Such revisions have impacted and may continue to impact our revenue share and our film gross profit. ... Under the Co-Production Agreement, we share equally with Disney in the profits of The Incredibles, Finding Nemo, Monsters, Inc., Toy Story 2 and A Bug's Life after Disney recovers its marketing, distribution and other predefined costs and fees." (Compl., ¶ 54.) Plaintiff then claims each of the statements in paragraphs 51, 54-55, and 57-61 of his Complaint are materially false and misleading when made because Defendants "intentionally flooded the market with millions of copies of *The Incredibles* home videos, far in excess of actual or forecast demand, in an effort to capitalize on a very narrow sales window." (Compl., ¶ 62.) According to Plaintiff, "flooding the market" had the effect of artificially

5

inflating the video sales for *The Incredibles* "in the days immediately following its release" and Defendants failed to disclose "the risk that large numbers of unsold home video units would be returned to [Pixar]." (*Id.*) Plaintiff further alleges that "Pixar lacked an internal system of controls adequate for the purpose of preventing the dissemination of materially false and misleading information." (*Id.*)

As the party bringing this action, Plaintiff is responsible for identifying with particularity what statements are false and misleading. 15 U.S.C. § 78u-4(b)(1). He has not fulfilled his responsibility in this regard, and the Court is "unwilling ... to search through" the Complaint in an effort to link the allegedly false statements to the reasons those statements purportedly are false. *In re Autodesk Sec. Lit.*, 132 F. Supp. 2d 833, 841-842 (N.D. Cal. 2000).

**2. Plaintiff has not sufficiently plead facts to show that statements clearly identified in his opposition brief are materially false or misleading.**

In his opposition brief, Plaintiff points to the following smaller excerpts he contends were false when made:

(1) "[P]reorders of *The Incredibles* home videos indicate that its domestic release will be as successful as that of *Monsters, Inc.*" and "we expect continuing international home video revenues from *The Incredibles* to drive our results for the second quarter," (made on February 10, 2005);

(2) "We recognize film revenue ... when earned and reasonably estimable." (made on March 17, 2005);

(3) "Looking ahead to the second quarter we expect to report earnings per diluted share of approximately $0.15. The primary driver of these results will be international home video revenues from *The Incredibles*...." (made on May 5, 2005); and

(4) "We have also made adjustments to our home video revenues for estimates on return reserves that may differ from those reported by Disney. In determining our home video reserves for a particular title, we review information such as Disney's current return reserves, the historical returns for our previous titles,

6

actual rates of returns, inventory levels in the distribution channel and other business and industry trend information that are available." (made on May 12, 2005).

(Opp. at 5-6, citing Compl, ¶¶ 51, 54, 57, 59.)

However, Plaintiff fails to allege sufficient facts to demonstrate that those statements are actionable. Plaintiff groups all these statements together and contends that they are *all* false for the *same* reasons discussed above, i.e. that Defendants "flooded the market" and failed to disclose "the risk that large numbers of unsold home video units would be returned to [Pixar]," and that Defendants had inadequate controls. (Compl., ¶ 62.) Plaintiff does not address whether the alleged market shift regarding video sales applies to both domestic and international sales. Nor does Plaintiff make clear what portions of these statements he contends are false. Does he allege that Pixar has not made adjustments to its home video revenues for estimates on return reserves that differ from those reported by Disney? Does he allege that Pixar does not review Disney's current return reserves or historical returns for previous titles in determining home video reserves?

Moreover, Plaintiff fails to allege how many videos Defendants sent out, how many were actually returned,[2] at what level Defendants set the reserves for *The Incredibles*, or what level of reserves Defendants should have set based on the alleged market trend. Nor does Plaintiff allege what amount Pixar "recognized as revenue" or what amount of such recognized revenue

---

[2] The only specific allegation Plaintiff sets forth regarding the amount of returns is vague and insufficient. Plaintiff alleges that according to Confidential Source 2 ("CS-2") who, during the Class Period, was a video buyer for United American Video, a DVD distributor involved in the distribution of *The Incredibles* DVD, "within 30 days after the initial release of *The Incredibles* (and the *Shrek 2*) DVD, United American Video began getting returns from its retail customers, especially the CVS chain." (Compl., ¶¶ 4, 50.) Plaintiff further alleges that, "[a]ccording to CS-2, the 30-day cycle was specific to those two DVDs. As much as 60 percent of *The Incredibles* DVDs were returned." (*Id*., ¶ 50.) Plaintiff does not explain what the "30-day cycle" is. Did CS-2 that mean that other DVDs did not start being returned within 30 days? How many of the *The Incredibles* DVDs were returned within this thirty-day period? Also, Plaintiff fails to explain what CS-2 meant by 60 percent. 60 percent of what number of DVDs was returned and from which stores? Without this type of information, these allegations are insufficient to support Plaintiff's Complaint. *Silicon Graphics*, 183 F.3d at 985 (holding that in the absence of specific details, the court could not ascertain whether there was any basis for the plaintiff's allegations).

1  was improper.  Finally, Plaintiff does not describe what Pixar's "controls" were or what controls
2  would have been adequate based on what standards.

3        Plaintiff also alleges facts which are inconsistent with his contention that the above
4  statements are false.  For example, Plaintiff alleges that the following statements are false: "We
5  have also made adjustments to our home video revenues for estimates on return reserves that
6  may differ from those reported by Disney.  In determining our home video reserves for a
7  particular title, we review information such as Disney's current return reserves, the historical
8  returns for our previous titles, actual rates of returns, inventory levels in the distribution channel
9  and other business and industry trend information that are available." (Compl., ¶ 59)  However,
10 in support of his allegation that Disney shared its data regarding the market with Defendants,
11 Plaintiff points to the same and other similar statements made by Defendants in other SEC
12 filings.  (Compl., ¶¶ 37, 38.)

13       Even more problematic is that Plaintiff fails to allege a sufficient basis to demonstrate
14 that before each statement was made on February 10, March 17, May 5, or May 12, 2005,
15 Defendants were aware that such statements were false or misleading.  Plaintiff alleges that "[i]n
16 the months preceding the Class Period, there was a dramatic shift in the pattern of sales in the
17 home video market" in that DVD releases started generating a greater proportion of their total
18 sales in the first week.  (Compl., ¶ 43.)  As support for the proposition that Defendants were
19 aware of this alleged market shift, Plaintiff points to an excerpt from newspaper article
20 published on May 31, 2005, after all of the alleged false statements were made, and an
21 announcement made on May 10, 2005, two days before the last alleged false statement, from
22 one company regarding disappointing sales from one video.  (*Id*., ¶¶ 43, 44.)  Plaintiff has not
23 alleged *any*, let alone sufficient facts, to support his contention that, *at the time the allege*
24 *statements were made*, Defendants knew of a clear trend that was well understood regarding
25 DVD sales in the domestic and international markets.  *See In re Dreamworks Animation SKG,*
26 *Inc. Sec. Lit.*, 2006 U.S. Dist. LEXIS 24456, * 7-10 (C.D. Cal. April 12, 2006) (find that series
27 of articles published in late 2004 and 2005, including May 31, 2005 article relied on by Plaintiff,
28

"[did] not suggest the existence of a clear trend that would have been well understood," but rather, "describe a fast-changing DVD market").

Plaintiff further alleges that when Defendants made the allegedly false statements they had information regarding actual returns which made their statements regarding expected revenue false. Plaintiff relies on confidential witnesses from third-party distributers and a former Disney employee to allege that Disney had access to detailed data and that Disney shared such information with Pixar.[3] Based on these confidential sources, Plaintiff alleges that Disney has "access to tremendous amounts of detailed data regarding the market for the home entertainment unit it distributes," and that Disney is provided daily reports. (*Id.*, ¶ 35.) While the confidential sources from distributors may have personal knowledge regarding how often their companies provide information to Disney, Plaintiff has not provided information demonstrating how the confidential sources would be knowledgeable as to how often Disney reviews or analyzes this information, or more importantly, when it provides such information to Pixar. Although CS-5 may have had information regarding when retailers provided Disney sales information when he or she worked at Disney, CS-5 did not work at Disney during the Class Period. Moreover, CS-5 does not provide any information regarding how often Disney reviewed or analyzed the sales information when he or she worked at Disney, or how often and in what form Disney provided such information to Pixar. *See Dreamworks Animation*, 2006 U.S. Dist. LEXIS 24456, at * 15-17 (in the absence of particularized information identifying internal reports of sales data and the contents of such reports, finding general statements by a confidential witness that Blockbuster sales data was provided to the defendant company on a

---

[3] During the Class Period, Confidential Source 1 ("CS-1") was a warehouse coordinator for Technicolor Video Services, a company that handled the distribution of Disney products. (Compl., ¶ 4.) Confidential Source 2 ("CS-2") was a video buyer for United American Video, a DVD distributor involved in the distribution of *The Incredibles* DVD. (*Id.*) Confidential Source 3 ("CS-3") was, and still is, a vice president of a purchasing firm that distributes DVDs and other products. (*Id.*) Confidential Source 6 ("CS-6") was, and still is, an independent contractor working with Entertainment Resources Inc., a distributory of entertainment products, including *The Incredibles* DVD. (*Id.*) Plaintiff alleges that Confidential Source 4 ("CS-4") was a Walmart Purchasing Assistant, but does not specify the time period in which CS-4 worked in this position. (*Id.*) Prior to the Class Period, ending sometime in 2004, Confidential Source 5 ("CS-5") was the Director of Sales Planning and Forecasting, International Division at Disney/Buena Vista Home Entertainment. (*Id.*)

9

daily basis was insufficient to support the allegations that defendants had knowledge of actual sales and returns of DVDs).

To support his allegation that Defendants were aware of the market data provided to Disney, Plaintiff also relies on the Co-Production Agreement between Disney and Pixar which provides that Disney shares its market data with Pixar. (Compl., ¶ 36.) However, fails to allege how frequently Disney provides such information to Pixar.

The Court concludes that Plaintiff has not alleged sufficient facts to demonstrate that Defendants knew, at the time they were made, that they alleged statements were false or misleading.[4]

### D.   Plaintiff Fails to Plead Sufficient Facts To Demonstrate Scienter.

The PSLRA also requires a plaintiff to allege particular facts giving rise to a strong inference that "the defendant made false or misleading statements either intentionally or with deliberate recklessness." *Vantive*, 283 F.3d at 1085; 15 U.S.C. § 78u-4(b)(2). Where the pleadings are not sufficiently particularized or where, even taken as a whole, they do not raise a strong inference of scienter, dismissal pursuant to Rule 12(b)(6) is proper. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002). Moreover, to determine whether a plaintiff has pled a strong inference of scienter, "the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper*, 298 F.3d at 897.

Plaintiff argues that Defendants had motive to lie in order increase stock prices during a period in which it was negotiating a new distribution agreement. (Compl., ¶¶ 39, 78.) Even if Defendant did have a motive to commit fraud, which the Court is not determining whether or not Plaintiff sufficiently alleged at this time, "[m]ere motive and opportunity is insufficient." *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003) (citing *Silicon Graphics*, 183 F.3d at 979). Plaintiff also relies on stock sales by Bax and Catmul, as well as sales by non-defendant insiders John A.

---

[4] Because the Court finds that Plaintiff failed to satisfy the heightened pleading standards in establishing falsity, the Court need not address whether the alleged false statements are protected by the safe harbor or bespeaks caution doctrine at this point. [**fix**.]

10

Lasseter, Sarah McArthur and Lois J. Scali to show scienter. "Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter, ... insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986 (internal quotations and citations omitted). Thus, courts consider the following factors in determining whether stock sales by inside officers or directors provide sufficient evidence of scienter: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*; *see also Ronconi*, 253 F.3d at 435.

In *Silicon Graphics*, the Ninth Circuit held that selling between 6.9 and 7.7 percent was a relatively small portion and thus not unusual or suspicious. *Silicon Graphics*, 183 F.3d at 987. The court found that the 43.6 percent sold by one senior vice-president of the company did not give rise to a strong inference of deliberate recklessness because: (1) he only sold only 20,000 stocks; (2) the amount was only 5 percent of the stocks sales with which the plaintiff was concerned; (3) the senior vice-president had only been with the company for one year and had no significant trading history for purposes of comparison; and (4) the other officers sold relatively insignificant portions of their holdings. *Id*. The court further held that the 73.3 percent sold by another senior vice-president was insufficient to allege scienter based on the circumstances of that case, including that he was forbidden to sell stocks before the class period and he did not make any of the allegedly misleading statements. *Id*. at 987-88.

In *Ronconi*, the court held that selling 10 and 17 percent of the insiders' respective stock holdings was not suspicious. *Ronconi*, 253 F.3d at 435. Even though one officer sold 98 percent of her stock during the class period, the *Ronconi* court found such allegations were insufficient to demonstrate scienter because the plaintiffs failed to allege sufficient trading history from which the court could conclude "that her trading was dramatically out of line with prior trading practices" and because the rest of the corporate insiders did not sell significant portions of their stock holdings. *Id*. at 436 (quotations omitted); *see also Copper Mountain*, 311 F. Supp. 2d at 875 (finding sales of between 17 and 21 percent not suspicious enough to raise a

11

strong inference of scienter); *In re FVC.COM Sec. Lit.*, 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000) (finding sale of 13.3 percent of defendants' stocks was "not suspicious and in fact suggests that defendants were not aware at the time of their stock sales that the ... press releases contained false information").

On May 10, 2005, Bax sold 30,000 shares, which was which was 15% percent of his stock holdings at that time. (Declaration of Cheryl W. Foung ("Foung Decl."), Exs. 11, 12.) However, Bax joined Pixar in 2004 and his options did not begin vesting until May 3, 2005, and thus he did not have any Pixar shares to sell before the Class Period began. (*Id*., Exs. 3, 11-12.) Without a meaningful trading history from which to compare, the Court cannot conclude that Bax's trades were suspicious and thus supportive of scienter. *See Vantive*, 283 F.3d at 1095 (finding that a defendant who joined the company during the class period had no relevant trading history and thus court was reluctant to attribute significance to the defendant's sale of 48% of his holdings during the class period); *see also Ronconi*, 253 F.3d at 436 (finding one officer's sale of 98% off her stock during the class period was insufficient to demonstrate scienter because the plaintiffs failed to allege sufficient trading history from which the court could conclude "that her trading was dramatically out of line with prior trading practices").

Between February 17 and May 18, 2005, Catmull sold 150,000 shares, which was at most 24.7% of his stock holdings.[5] Standing alone, the sale of almost 25% over a five month period is not suspicious. *See Ranconi*, 253 F.3d at 435 (finding 10 and 17 percent of the insiders' respective stock holdings was not suspicious"); *see also Copper Mountain*, 311 F. Supp. 2d at 875 (finding sales of between 17 and 21 percent not suspicious enough to raise a strong inference of scienter); *FVC.COM*, 136 F. Supp. 2d at 1039 (finding sale of 29% by one insider insufficient to demonstrate scienter). Moreover, Catmull's stock sales during the Class Period must be considered in light of his trading history. In the two quarters before the Class

---

[5] Plaintiff alleges that Catmull sold 24.7% of his holdings. (Compl., ¶ 77.) Defendants argue that Catmull actually sold only 19.7 % of his holdings, or 14.4% of his holdings if the shares he beneficially owned on behalf of his children and trusts were considered. (Mot. at 22.) It is not clear to the Court based on the documents attached to the declaration of Cheryl W. Foung how either party has calculated Catmull's total holdings. However, even if the Court were to consider the higher percentage proffered by Plaintiff for purposes of this motion, such percentage would be insufficient to demonstrate scienter.

12

Period began, taking the stock split of April 2005 into account, Catmull sold 100,000 shares. (Foung Decl., Exs. 6-7.) Thus, his sales during the Class Period were not "dramatically out of line with [his] prior trading practices." *See Silicon Graphics*, 183 F.3d at 986.

Finally, when the holdings of all three individual defendants, Bax, Catmull and Jobs, are considered, the individual defendants sold less than 1% of their total holdings. (*Id.*, Exs. 3, 8-12.) Even if the sales and holdings of insiders John A. Lasseter, Sarah McArthur and Lois J. Scali alleged in the Complaint are taken into account, the insiders retained over 99 percent of their total holdings. (*Id.*, Compl., ¶ 77.) This fact undermines any inference of scienter. *See Silicon Graphics*, 183 F.3d at 986 (finding no strong inference of fraud where defendants retained over 90% of their stock holdings); *see also FVC.COM*, 136 F. Supp. 2d at 1038 (finding no scienter where defendants retained over 86% of stock holdings and all insiders retained over 90%).

Plaintiff argues that the lack of stock sales during the Class Period by Jobs, the chief executive officer, chairman of the board and the largest share holder, does not weigh against a strong inference of scienter. However, the cases Plaintiff cites in support of this argument are inapposite. *See America West*, 320 F.3d 920; *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir. 1996); *In re Cabletron Sys., Inc.*, 311 F.3d 11 (1st Cir. 2002); *In re U.S. Aggregates, Inc. Sec. Lit.*, 2003 U.S. Dist. LEXIS 12168 (N.D. Cal. Jan. 24, 2003); *In re Nuko Info. Sys., Inc. Sec. Lit.*, 199 F.R.D. 338 (N.D. Cal. 2000).

In *America West*, the plaintiff alleged that stock sales by nine officers and directors and two majority shareholders supported a strong inference of scienter. *Id.* at 938. In that case, "[m]ost of the individuals sold 100% of their shares, with the lowest percentage being 88%," and the two majority shareholders both sold over 99% of their publicly-traded stock for a total of $66.5 million. *Id.* at 938-39. The court found the large numbers and percentages sold, the timing of the sales, and the prior trading history of each defendant indicated the sales during the class period were unusual and suspicious. *Id.* at 939-41. Despite this strong evidence of scienter, the defendant argued that the lack of stock sales by three other defendants who made the misleading statements undermined the inference of scienter. *Id.* at 944. However, the

13

plaintiff alleged that these three defendants were motivated to inflate the company's financial results and stock prices for a different reason - their eligibility for stock options and executive bonuses were based principally on the company's financial performance. The plaintiff alleged that these defendants did not receive any option awards based on the year before the class period, and after the inflated financial results, they each received substantial option awards. *Id*. The court found that the plaintiff's allegations thus supported a strong inference of scienter. *Id*. In contrast here, Plaintiff has not alleged that Defendants personally reaped economic benefits other than by alleged insider trading. Accordingly, Plaintiff's reliance on *American West* is misplaced.

In *McGann*, the court evaluated whether an accounting firm that allegedly prepared a fraudulent audit report knowing that its client would disseminate the statements in the report to the securities market could be held primarily liable under Section 10(b) for committing fraudulent acts "in connection with the trading of securities." *McGann*, 102 F.3d at 391. In other words, the issue in *McGann* was not whether the defendant acted with scienter, but rather, whether the alleged fraudulent acts fell within the purview of Section 10(b) and Rule 10b-5 at all. The court affirmed that "Rule 10b-5 is violated whenever assertions are made ... in a manner reasonably calculated to influence the investing public." *Id*. at 393 (quoting *Wessel v. Buhler*, 437 F.2d 279, 282 (9th Cir. 1971). Thus, the court held that to be liable under Section 10(b), the fraud did not need to be connected to a particular securities transaction by the defendant. *Id*. at 394. Here, there is no issue as to whether the alleged conduct, if fraudulent and done with scienter, was "in connection with the trading of securities." Therefore, *McGann* is inapplicable.

*Cabletron*, *Nuko Information*, and *U.S. Aggregates* are similarly inapposite. In *Cabletron*, the court found that complaint adequately demonstrated scienter without the allegations of insider trading and thus, the court specifically refrained from determining whether the insider trading allegations would have sufficed standing alone. *Cabletron*, 311 F.3d at 39-40. In both *Nuko Information* and *U.S. Aggregates*, the plaintiffs did not rely on allegations of insider trading to establish scienter. Therefore, the courts found that the failure to allege selling

14

or trading did not negate the inference of scienter. *Nuko Info.*, 199 F.R.D. at 344; *U.S. Aggregates*, 2003 U.S. Dist. LEXIS 12168, at * 12. In contrast here, Plaintiff relies heavily on allegations of insider trading to establish scienter. Therefore, the absence of insider trading by a defendant is highly relevant and undermines any inference of scienter.

Accordingly, the Court finds that Plaintiff's allegations are insufficient to demonstrate a strong inference of scienter.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss. This ruling is without prejudice to Plaintiff filing an amended complaint. Plaintiff shall file any amended complaint within thirty days of the date of this Order. If Plaintiff does not file an amended complaint within thirty days, this case shall be dismissed. If an amended complaint is filed, Defendants shall either file an answer or move to dismiss within twenty days of service of the amended complaint.

**IT IS SO ORDERED.**

Dated: September __, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE